The Honorable Justice of the United States Court of Appeals in and for the 7th Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this honorable court are admonished to draw near and give their attention as the court is now sitting. God save the United States and this honorable court. The court is now in session. May it please the court. Suppressing material exculpatory evidence, directing the female accuser to lie during the Title IX process, and misrepresenting to John Lee non-existence of material records is sufficient alone for this court to decide whether or not to proceed. And a reasonable jury to find in John's favor. In addition, the totality of uncontroverted procedural irregularities favoring the female accuser and disfavoring John establishes a reasonable inference of sex discrimination precluding summary judgment. It must be remembered, on USI's motion for summary judgment as to the Title IX claim, they designated no affidavit attesting that these procedural irregularities were the basis of mistake, administrative oversight, or some benign reason. It designated no expert testimony that these procedural irregularities were consistent with Title IX best practices or consistent with a fair, thorough, and impartial hearing. Mr. Burkhart, what's the connection that you and your client are contending between alleged procedural irregularities and anti-male bias? Well, as this court has said in the first go-around in the preliminary injunction, if you have procedural irregularities to a certain level, certain lopsided, certain material, it can lead to an inference of sex discrimination. That's John's point in this case, is that these material procedural irregularities were so significant, so extensive, and solely favoring Jane and disfavoring John that they lead to an inference of sex discrimination. What about the irregularities, though, connected to his maleness, such that he's being treated differently than a female? Well, first off, they withheld these material documents, the reports that they had in their case file, which were statements by Jane Doe. They withheld the other Title IX complaints that Jane Doe had. All these were inconsistent with her story and her account. They also advised John, misrepresented to him, that there were no other records in the file relating to misconduct when it knew that Jane Doe had multiple other ones she had filed. All these go to favor Jane to ensure that her account is consistent and to make it look like he is one responsible. Something that's impeached could be used to impeach, or something that might be damaging to the person on the other side of the V doesn't necessarily make it gender specific. This is a Title IX claim for sex discrimination. What about the alleged procedural irregularities make it an anti-male conclusion? Well, I would say the inability to possess these documents and this information prevented John from having the opportunity to cross-examine Jane, to undermine her credibility, which was the key for the decision. And I think those go to gender bias. And I think in addition... Well, flip the script. I'm sorry. Go ahead, Judge Hamilton. I would have thought the theory here is that, as in the McDonnell-Douglas test in employment cases, where the employer fails to articulate a legitimate non-discriminatory reason for actions taken against a plaintiff who's made a prima facie case, under the McDonnell-Douglas test, that permits, at just step two, an adverse inference of, in essence, unlawful intent. Is those elements present here? I think, yeah. I mean, USI did not rebut any basis for the procedural irregularities. In fact, they basically ignored them. So I think there's no... They have the burden. There's nothing from them. But your argument is that from that, is that circumstantial evidence? Well, I think it's... There's no reported Title IX case where a university's raised its hand and said, I discriminated. So we deal with, is it a reasonable inference? And here, when all the material evidence shows that her account was inconsistent and that was all withheld, the only reasonable basis is that it was based on gender. But unpack that for us, because if we flip the script and we say the accuser here is male and the plaintiff, in this case, would be female, what about the evidence connects it to the gender of the party? Well, I think some of it goes to also the social media posts. I mean, these were all USI public pressure saying, you're not taking this woman's sexual assault claim seriously. And USI went about these means of removing the Instagram page. They also have this report from this student challenging, or petition, asserting that John sexually assaulted seven women, which USI knew there was no evidence. They knew that violated their policies, but USI took no action against this woman. And in addition, when John went to USI and said, hey, I have all these harassing posts from these female students at USI, USI didn't tell him that he could file a sexual harassment claim. What they told him is, well, you have to go to public safety or the sheriff's office. So USI didn't view men as could be sexually harassed. They said, look, these are women. But was there any policy that required them to tell him that? And is there any evidence that they told women otherwise? Well, their duty is to comply with Title IX. So if he comes in and says, I have this information, yes, they have a duty to say, you can report this and we can address it. But they didn't. And I think the other point on this USI wants to make is this delegation. We delegated to outside experts. But there's three duties that they had when they did that. One is to gather evidence. And what USI said is, we delegated to the experts also the determination of relevancy for the hearing and investigation. So USI had to gather whatever it possessed, because these were outsiders who didn't have access to FERPA-protected documents. And then they had to give those to the outside experts to review, which John would have been able to review to respond to. But USI didn't gather this outside information that they possessed. And so the third duty they had is when they get the reports back and they get the decision, it says in there, this came down to credibility. And Jane's account was consistent over time. John was not, and he changed his story. And so USI, when it got that, it has the ultimate duty to ensure Title IX compliance. And it had this information that the only thing consistent about Jane's account was her inconsistency. She had made multiple statements that were inconsistent. USI, in its answer, admitted that Jane had made a prior now, prior to the hearing, an allegation that John committed forcible sexual intercourse with her. So she changed her story multiple times. And they also knew John had not changed his story, because again, the undisputed evidence, unchallenged, was that John informed Title IX back in February, prior to the formal complaint, that of this prior sexual encounter with her that was at her request and her consent. So the university, at every stage, had the opportunity to take corrective action, but it didn't. And then we know... Mr. Burkhart, excuse me, can you, on this question about documents that were not provided, and especially prior statements by Jane Doe and the evidence of John Doe's prior statement, does the record show that John Doe or his attorney or representative requested disclosure of documents that would include all of those statements, or is your position that the university had an obligation to provide them on its own initiative? One, yes. Under Title IX regulations, the university did have the legal obligation to produce and gather that information. Secondly, John did request that information at his March meeting with the Title IX personnel, and that's when he asked if there were any other reports against him. And USI told him, no, there were no other reports. So when he did ask, they misrepresented. Did he? I'm sorry, go ahead, Judge Hamilton. Was Mr. VonderEye representing him at that point, or was that the meeting with his parents? Meeting with the parents. Okay, thank you. Go ahead, thanks. You said that Title IX requires them to turn over. What are you relying on in Title IX in particular that requires them to turn over these reports that were not turned over? The regulation requires the university to gather evidence sufficient to make a determination. And USI again said, we're leaving relevance determination for the outsiders. So USI had to gather what they had in their possession because these people didn't have access, and then they had to produce those, and they didn't. They withheld them. So your argument is that the regulation that talks about gathering also imposes a turnover? Absolutely. I mean, how else can you have a Title IX hearing that's fair, thorough, and impartial if the university doesn't turn over what it possesses? And I'd like to make a comment about the expungement, the district court. What the district court has said is that even if John shows sex discrimination, Title IX does not allow for expungement of the discriminatory decision or expunging educational records of that. And that's one that just flat out ignores this court's precedent in Dobey-Purdue, where the court said marred records are a continuing injury for which Title IX expungement is appropriate. And every court that's addressed that has said expungement is appropriate for Title IX remedy. The district court has simply misapplied the law. And just to confirm, you're no longer pursuing your injunctive relief claim regarding readmission, correct? Correct. And then if I may touch on pseudonymity, the district court basically said, look, there's a bright-line rule, which says you've got to put the round peg in the round hole or you can't get pseudonymity, and that's either show minority status. I'm not sure that's really a fair characterization of the district court's decision on this issue. If we were to affirm on that point, does John want to pursue the case? Absolutely. But his point is the district court didn't consider the risk of mental harm, which I think in the most recent Young case, this court said any risk of harm, and so it includes mental harm. But secondly, the court didn't consider in the balance of harms the confidentiality under Title IX. And in this case, what's a little different about this case is the procedural history. We were done with discovery when the court issued its show cause order about pseudonymity. So we knew about all the covert activity that the defendants had done. And so what that says is why should this young man have to give up his identity when he's in court because of the inappropriate activities of these defendants? The whole purpose of Title IX is to protect that confidentiality. And additionally, there were direct social media posts prior to the Title IX hearing. In the Title IX hearing, Jane Doe and her roommate were told it's confidential. You can't do anything or you face repercussions. In that case, the social media posts stopped. Now the magistrate said, well, these are two years old, so if you remove pseudonymity, we're not sure they're going to restart. And that's right. We don't have a crystal ball, but what we do have is the past, which is a good indicator of the future. And here this young man had a risk of physical harm, clearly particularized to him and his mother. He suffered mental harm from this. We had the evidence that he was suicidal. You, as I knew. Our court hasn't recognized the mental harm component. I take it you're asking that we do recognize the mental harm component. I would say this court's decision in Young most recently this year, what it said is a substantial risk of harm. It didn't say physical harm, and I think that recognizes what's the difference between physical harm and mental harm. We know today that mental harm of these young kids is just as great as physical harm. I can't imagine the court had this distinction that, look, we're only talking about physical harm. Mental harm, sorry, tough break. And I think, one, I think the Young case can be read to say, hey, look, harm is harm, and that's a valid basis. So I think mental harm is that as well. We think this is that exceptional case. This isn't a slippery slope. It's the exceptional case where pseudonymity outweighs the public's interest in his identity. I'd like to pose a question on the policy amendment, the change from the NIBRS definitions to the USI definitions. Is it your argument that the definitions were only changed as to John and not others? Absolutely. I mean, what we have is... So the definitions currently being used by USI, they went back to NIBRS, or USI uses the same definition for John that they did for all other current ones? They use the current definition for rape. The forcible fondling is different. So unpack that for us. How does that impact the defense that John is offering, the change in definitions from NIBRS to what USI used here? Twofold. One is USI... We said, look, this... Karen Nutter testified, yes, you can't change these definitions between investigation and hearing. But they did it anyway. That's not the question. The question is, how is there any prejudice to John's defense here? We understand all this controversy about process that you've raised, but we're looking for substantive prejudice. Well, what this is is just another example of a procedural irregularity. And what USI... Is there any substantive prejudice to John's defense from any of those amendments? No, that didn't affect his defense. But what it did do is show that this was another procedural irregularity, contrary to Title IX. And what USI said is, well, it's not really a procedural irregularity because we had these pre-hearing policy amendments that were approved and implemented. And they showed this nice spreadsheet. And what we said is... Thank you, Mr. Berkman. Could I interrupt you? I know we're into your rebuttal time, and I don't know how tight we're going to be about time today. But there's an important question I'd like to raise with you about the regulations. The regulations for these kinds of proceedings refer to evidence that is relevant and not otherwise improper or impermissible, right? Yes. And my question is whether there's an argument under the regulations that interviews with a so-called confidential employee are, quote, impermissible evidence. I would say absolutely not. These were... Let me just... I'll be interested to hear what the defendants have to say about that question. But I understand you to be arguing that even if there were a rationale for withholding some of these documents under the regulations, that your client has a due process right, at least given the closeness of the case and the centrality of credibility disputes here. Is that right? Yes. And I would say... Okay. Go ahead. No, my other point was not only did they withhold these documents, which contained statements and inconsistencies of Jane, they told Jane, don't disclose this information during the Title IX process. So she possessed that same information, but she lied under oath, and John had no way of being able to undermine that credibility. And so that's the other point is not only was that withholding by USI, it was deceit by the accuser herself. I'd like to reserve the remainder of your time for rebuttal. Yes, Your Honor. Very good. Thank you, Mr. Burkhart. We're going to move first to Mr. Keeley for your argument. Thank you, Your Honor. William Keeley for the defendants, University of Southern Indiana, Beth Devinshire and Damian Doss. The court has seen this case before. This panel has seen this case before. And when this panel looked at this case before, the court described the fulcrum question as whether the university discriminated against John on the basis of his sex. Mr. Keeley, a few years ago when we looked at this, this case looked very, very different, at least in my view, where we were presented with a decision by a panel that made a credibility decision. And where Jane, Jane's accounts were consistent, John seemed to be inconsistent. And these documents that have surfaced in the meantime seem to me at least to have offered an opportunity for John to flip the script. They show inconsistency on her part, or at least grounds for impeachment. And there's evidence from John that the dramatic change in his story was in fact not a change in the story. Could you focus on those documents? Certainly, Your Honor. First, how it was and why they were not disclosed to the panel or the investigator or to the parties. We're talking primarily about one document in particular, which was a prior report by Jane of a prior fingering incident by involving John. And that prior report by Jane, she did not pursue as a Title IX allegation. And the report simply went into the archive as a dormant report. Importantly... You said that happened in October when they first met? That's correct, which is different than what John testified at the panel hearing, which was a few weeks before November 13th. Not a week before. You said a week before. A week before. And we also have the reports of those initial interviews with the Title IX staff that both Jane and John had. Yes. And those interviews involved the then-Title IX coordinator, Carrie Lynn, who the plaintiff chose never to depose, never to elicit any evidence from her as to whether she considered those documents to be relevant to Investigator Peterson's work, whether she remembered those documents in any particular detail. And so when they came at the summary judgment stage with the plaintiff's burden of production, the plaintiff came forward with no evidence whatsoever to explain whether those documents were simply overlooked or whether Ms. Lynn was waiting for Investigator Peterson to request them or whatever other state of mind... How is the failure to disclose those consistent with the Title IX regulations, if at all? The regulations require that the investigation gather the documents that are sufficient for the investigation. It says that the decision-maker is entitled to all relevant and not impermissible evidence, right? Yes. First, the document as to the prior report was simply not the incident that was under investigation. It was a different incident. It was sexual history evidence that John said to the investigator didn't exist, wasn't worth looking into. He said, there's nothing there. You don't need to look at that. All we ever did was kiss. Did John say that? Yes, he did. How complete was the question? Very complete. It's very conspicuous in Investigator Peterson's report. That's Demetrius Peterson? Yes. So John himself steered the investigation away from sexual history evidence. I understand that point, but I'm still very troubled by... But let's worry not so much about that buried report as about the interviews concerning the November 14 incident, which seemed to me to provide a good deal of impeachment potential, if they were provided. If John had argued at summary judgment how they would have been useful as impeachment, the summary judgment record would speak to that. But in fact, we'll recall that his contention at the panel hearing was that he was never in Jane's bed at all, that she was mistaking the night in question, November 13, for a prior non-drunken encounter on an earlier date. So the consistency of the detail of her recollection as an extremely intoxicated individual during this encounter was not central to the panel's process. I beg your pardon? What was not central? Jane's own recollection. When this court decided this case in 2022, the court spotlighted that the panel relied on the eyewitness testimony of the roommate as to John being in her bed, and the fact that the day after, Jane told her roommate about John's conduct. Although she didn't tell the roommate at that time that it was without consent, and the account given to the Title IX folks in February of 2021 seems to be missing an awful lot of material that would have seemed central and would have been pretty good grounds for impeaching cross-examination. If we just take as an assumption that there was more impeachment available to John than he used at the hearing, the question remains for a Title IX anti-male bias allegation, whether Title IX Coordinator Lynn withheld, concealed in John's word, those documents to somehow hobble Investigator Peterson's work and hobble the panel's work. And there is no evidence that makes that anything other than a sheer speculation. How does the failure to produce that information, how is it consistent with the regulations or with the due process clause? Well, consistency with the regulations, as the court discussed in 2022, is just a regulatory compliance question. If you look at it… Here we're talking about the fundamental fairness of the proceeding on a case that the panel seems to have treated as a 51-49 credibility contest and the purported consistency, the apparent consistency of Jane's accounts was a big, very big deal for the panel. If it were that big a deal in the eyes of John, he would have deposed Title IX Coordinator Lynn and elicited testimony to show that somehow she considered those documents and chose to withhold them. He didn't do that. Why didn't he do that? He wanted instead, apparently, just to speculate. And that's not enough at summary judgment. Could you answer for me how the failure to produce those documents is consistent with the regs and the due process clause or is your answer, by not answering that, simply that it cannot be defended under either? No, it is consistent with the regulations because the regulations don't make those documents per se relevant, number one. Number two… Why not? Why not relevant? Well, first the… They are a summary of an account from the complaining party closest in time, the first account the university hears of the incident, right? Yes, they are. So we're setting aside the prior report, which was a different incident altogether. If the individual who had custody of those documents thought that they were inconsistent, thought that there was detail in them that didn't make it into the formal complaint and chose, knowing those, having that state of mind, not to forward those documents, then we could pursue that angle. But there is nothing in the record to suggest that that was the thought process. So if we postulate… Is that shifting the burden back, though? I mean, if they've come forward saying, these are material that could have been used to challenge Jane's credibility and you didn't produce them, period. Well, this is a Title IX allegation, not a due process allegation. Well, there is a due process claim here, too. Count two. As to Title IX, at least, there would need to be an anti-mail state of mind. I understand. Yes. But there is a due process claim here, and they've based it both on a property and a liberty interest. Well, that's the Section 1983 claim, which is against individuals, not against the university, and particularly not against… Against individuals in their official capacity, seeking injunctive relief from… Yes, but not against the individuals who were involved in Investigator Peterson's work. There is no claim against Title IX Coordinator Lynn. What about Doss? Who was her successor, Devonshire or Doss? Devonshire, yeah, who came on after the Peterson investigation was over. There's one against Doss. I'm sorry, Judge Hamilton. Go ahead. There is a claim that was dismissed at the 12B6 against Doss and Devonshire, based on due process.  Although the… Well, Devonshire came on after the Peterson investigation was complete, so her connection was to the panel. That would be the proper defendant for injunctive relief in official capacity under ex parte, yeah.  I don't disagree with that. The allegation against Doss, he was the subordinate to Lynn who was not named. So for whatever reason, the plaintiff not only chose not to depose Lynn or designate any evidence regarding what she did or didn't do, the plaintiff also chose not to name Lynn. Those are tactical choices that the plaintiff made that I do think bear on these questions. Thank you, Mr. Keeley. We'll move now to Mr. Bocchino.  Good afternoon, Your Honors. Andrew Bocchino on behalf of the appellees, Grand River Solutions, Inc., and Karen Nutter. May it please the Court. I think it makes sense to start with the pseudonym issue. There's been a lot of talk of the merits, but I'd like to make sure that we run down the pseudonym issue. Of course, if Your Honors have any questions about the merits against these appellees, I'll be happy to answer those. I do, but do you think the district judge or the magistrate judge rather abused his discretion in 2021 in granting pseudonymous status? Not necessarily. I mean, there wasn't an evidentiary hearing or anything with respect to that, and that was before we had the very clear standards here that the Court handed down in the Indiana University and Loyola University cases. So I don't think there was an abuse of discretion from Magistrate Judge Wiltman. So the Indiana University case and the Loyola University case is what prompted the show-cause order in this case. And in those cases, it was held that certain justifications need to be met, which included a litigant's status as a minor, which we don't have here, and a substantial risk of harm, either physical or retaliation. And these are going to be looked through the lens of what the Court has called a balancing test, and that is weighing the balancing of harms and interests between the need to proceed with pseudonymity and the strong federal policy for years that one needs to litigate in the federal courts publicly. And the circuits have been split here. We've got a number of circuits talking about mental illness. We've got a number of circuits talking about mental harm. And then we've got the Sixth and the Seventh not speaking to it. I posed a question to your colleague with regard to recognition of that. What's your position on that question? So I don't think it's totally out of the question that mental health or mental anguish harm can never be included as a justification. I know in the Seventh Circuit it hasn't yet. I think there's some language in the Indiana University case that I think has come close, talking about embarrassing information, and that is not a justification for pseudonymity. Is there a record here for that? No, Your Honor. There was not any evidence. Say we consider emotional harm in this case. There was not any sufficient evidence in this case about emotional harm or a risk of emotional harm. The only evidence that was designated, Your Honor, was the 2021 social media messages. Granted, they were vulgar, and I believe there was a 2021 online petition that did not identify John directly. There was the CARE Act document that may have been hearsay coming in through a friend of John's? Correct, correct. And if we were to take all of those, they were all recognized and weighed by the district court. And so we have to remember that this is also an abuse of discretion standard. And under an abuse of discretion, the court needs to weigh the evidence and apply the law, and that's what happened here. And so I'm not saying that mental health harm can never be considered, but I don't think this is the case where this court ought to adopt it. Mr. Burkino, can I ask you some questions about the merits here? Yes, Your Honor. As I understand it, your clients are experts in Title IX. Yes, Your Honor. And they do this for a living. Do you have any... As I've been reading this, if I had been in Ms. Nutter's position, I would have been pretty distressed to learn about these documents that were not turned over to the investigator or to the parties for possible impeachment. What are your thoughts about that problem? No, you're right, Your Honor. And I think it's important to understand the timeline of when Grand Rivers and Nutter actually gets involved in this. And so you have the complaint, the statements... No, they don't get these documents. Correct, yeah. There were documents that we were not... Is that consistent with your understanding of the way the regulations are supposed to work and best practices in handling Title IX? I mean, I think it is best practices to have the independent contractor, such as Grand Rivers and Nutter here, to receive all the documentation from the institution. And from that documentation, when the hearing starts, there is a determination of relevance from these independent contractors. And so I think it is standard in the industry that we receive these documents. But I can't speak to whether it's standard in the industry to not receive certain documents. I think that's a better question for the institution here. Is there any requirement on your client to make sure they have all of the relevant documents? Well, there might be. Now, it depends on... And did they take any actions here with the university to make sure, have you turned over your files, let me see your files, whatever the question might be? Correct. And so I'll respond to that by saying, you know, we don't know what we don't know. And so if there were documents withheld before we conducted the hearing, then I don't see how we can anticipate that there aren't any documents. But is there any evidence that your client took any actions with respect to the university to ensure that they had provided them with all the relevant documents? There were emails between the university and the appellees that basically had some give and take as to certain charges and stuff like that. But I can't point you to one, to a piece of evidence specifically where we said, hey, USI, is this all of it? You know, what else do we need? We presume that we receive all relevant information. Anything further, Mr. Bocchino? No, nothing, Your Honor. Thank you, Mr. Bocchino. We'll move now, Mr. Hoffman, to you for oral argument. Thank you, Your Honors. You know, the word that comes to mind on this, the only count against my client, DSA, Dolores Stafford & Associates, is for this intentional inflation of emotional distress count. And the word that comes to mind that's really not used in the case law, but just came to my mind, is heinous. So basically, it's such an extreme standard that the conduct that has to be alleged and proven has to be just heinous conduct by... How do you think that would apply, let's say, to the procedures that were alleged in the Purdue University case, which essentially described a kangaroo court? I think it's a little different here. I think at the Purdue case, I think it was a little bit more... Could that meet the heinous and outrageous standard? I don't think so. I really don't. And I was thinking about this. To meet the heinous standard, it's almost as if, you know, Beth Devonshire, who was the 1099 for the Dolores Stafford, would have had to have gotten some sort of call that said... Maybe even from Jane Doe herself to say, listen, he's innocent, but I want to railroad him, I want to put him in jail, and I want you to go along with it. And Beth Devonshire would have to say, yep, I'm going to do it. To me, that's how... That's heinous. That's outrageous. That's extreme. You know, the case law says it's so horrible and, you know, World War II-like that someone exclaims, I can't believe that someone did that. That's just outrageous to me. And there's really, with all due respect, to John Doe, they're claiming procedural irregularities, they're claiming prejudice, but it doesn't rise to the level of that extreme intentional conduct that the people knew was going to cause this gentleman extreme harm and ruin the rest of his life, basically. It's just... And Beth Devonshire especially is removed from this. The panel seems to be really concerned about the withholding of the evidence, but the investigation was done by the time Beth got involved in the case. And whereas Ms. Stafford, the owner of DSA, says, I stand behind my people, she's even more removed from it. But it's just a situation where, you know, everything is unfortunate about this case, but it's not to that level that the case law demands that's just so far out there to mean that the judge was wrong on a 12B6 not to exclude my client from the case. It's just... It's a really, really, really high bar. Maybe the highest possible bar you can get in civil litigation. And it's just a question of, yes, there's irregularities that the panel is discussing, but was any of this, especially as to Beth Devonshire and her principal, if you will, DSA, that you can say is just cry out in outrage as to what they did, and it's just simply not there, Your Honours. Thank you, Mr. Hoffman. Thank you. Mr. Burkhart, we'll move back to you for rebuttal. We'll increase your time to four minutes. Let me just start off where Mr. Hoffman finished talking about Beth Devonshire and what he said is basically, yes, she did some bad things, but they weren't just bad enough. Well, let me tell you one of them. On June 11, as USI admitted, Jane Doe gave her investigative response, which said, I'm not making any charge of nonconsensual kissing. I'm not making that. On July 26, Beth Devonshire, without ever talking to Jane Doe, comes up with this new violation that she gives a week before the hearing, one of the new charges, nonconsensual kissing. So she manufactured this charge right before the hearing, and what else did she do? She changed this definition to rape. What worse can you have for a kid, a black young man in a rape charge? And she makes this definition contrary to Title IX, contrary to the policy on the NIBRS definition. But I thought you indicated earlier that your client wasn't prejudiced by the change in the definition. He certainly wasn't prejudiced by it. His defense remained the same. He didn't do it. But what it shows is the egregious conduct of this Ms. Devonshire. Why would she do that? And it goes to USI. Did USI ever say, why did you conceal these documents? Why did you have Jane lie? Why did you tell John these documents didn't exist? What's the reason? They don't have one. The reason is they had public pressure. Everybody was out there accusing them, you're not taking these claims against women seriously. And there was only one acceptable outcome to them, make this kid responsible. You're talking about relevance, Your Honor. But if you remember, Devonshire testified, we left relevance determination for the outsiders. So USI wasn't making that call. They had to gather the documents, give it to them. And they didn't do it. Remember what Nutter said? I took a broad scope of relevance for the hearing. The first 10 minutes, she's asking Jane Doe, what other women did John sexually assault? Who were they? All this hearsay, but she said that's relevant. Okay, guess what? All these reports fit right in there. Because what they showed is it was Jane who was inconsistent. Remember what Nutter said also? She said these records, and Devonshire said this too, these records should have been produced because they showed inconsistency in Jane's account. They showed and affected her credibility. And so what more could John show to support an inference of gender bias? The only thing he could have shown, besides a university lying, concealing, suppressing, is that the president stood up and said, you got me. We discriminated on the basis of sex. And there's not a single reported case where a university has ever admitted to sex discrimination. That's why we look at is there an inference. And guess what? This is summary judgment. It's USI's motion. All facts and inferences in John's favor.  Mr. Berker, when did you actually obtain the so-called concealed documents? Was that in discovery in district court? Yeah, it would have been discovery. I mean, you know, you kind of hit on it. We're up here the first time on preliminary injunction. USI's position is we did this good faith commitment to truth telling. You kind of got a duty of candor to the court. Maybe this court would have been interested to know that they suppressed evidence, they told Jane to lie, that they misrepresented to John. But they didn't. And they're here today blaming John again. It's his fault that USI concealed records. It's his fault that they told her to lie. Mr. Berker, I know this isn't in the record, but what is John doing today? Did he go back and complete college? It's in the record where he applied for another school, but when it came time, when he had to fill out, have you been determined, it was basically a disciplinary disclosure. So he would have had to disclose that he had a Title IX rape determination. Did he apply anywhere else? No. Okay. If I may, with the indulgence of my colleagues, on this intentional infliction of emotional distress claim, did John file a timely notice of court claim under the Indiana Court Claims Act? Yes. We believe it was timely filed. When? I can't tell you. I frankly was kind of mystified by all the back and forth. I don't see why you have to plead any of that, but I was looking for a representation on your part that in fact you could have amended to satisfy the district judge on that point. Well, to that point, one, the Indiana Supreme Court says you don't have to. That's not my question. Okay. Why we didn't amend? Yes. Because, I mean, we were talking. If you indeed complied, why not amend to make that allegation? Because the law is that you don't have to plead it. It only becomes an issue when it's put in affirmative. Mr. Burkhart, if you want to stand on that principle and you're entitled to do that, but I'm trying to think about what's the point of fighting about whether it has to be pled or not when you are able to plead and amend? I mean, I can't answer about why we didn't do two years ago. I mean, we filed a second amended complaint. It's not required. If USI wanted to raise it, they could have raised it in summary judgment. I mean, so I can't. If one was filed, I can tell you that. Thank you, Mr. Burkhart. Thank you, Mr. Keeley, Mr. Hoffman, Mr. Benneken. We'll take the case under revisement, and the court will be at recess.